UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------ x
CRC INSURANCE SERVICES, INC.,

        Plaintiff,

        -against-

KEVIN HAHN,

        Defendant.
------------------------------------ x

**COMPLAINT**

Index No. _____

CRC Insurance Services, Inc. ("CRC" or the "Company"), by and through its attorneys Ogletree, Deakins, Nash, Smoak & Stewart, P.C., brings this complaint against Kevin Hahn ("Hahn" or "Defendant"), alleging as follows:

## NATURE OF THE ACTION

1.    This is an action for breach of contract, misappropriation of confidential information and trade secrets, unfair competition, tortious interference with employment relations, breach of fiduciary duty, conversion, attorneys' fees, and injunctive relief pursuant to Rule 65 of the Federal Rules of Civil Procedure ("FRCP"), arising out of Hahn's refusal to honor the terms and conditions of his non-solicitation and non-disclosure agreement with CRC.

## PARTIES

2.    CRC is an Alabama corporation with its principal place of business in Birmingham, Alabama. CRC maintains its New York offices at 1325 Avenue of the Americas, New York, New York 10019.

3.    On April 2, 2012, C.G. JCF Holdings, Inc. ("C.G.") assigned its rights in agreements that it had entered into with certain of its employees to CRC (the "Assignment").

4.    Upon information and belief, Hahn is an individual with a residence at 12 Schoolhouse Way, Dix Hills, NY 11746.

## JURISDICTION AND VENUE

5.	This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332(a)(1). There is complete diversity of the parties, as Hahn is a citizen of the state of New York, and CRC is a citizen of the state of Alabama. The amount in controversy exceeds $75,000, as Hahn's improper solicitation of CRC employees and improper use of CRC confidential information has resulted in losses to CRC in excess of $75,000.

6.	Venue is proper in this Court because a substantial part of the events giving rise to these claims occurred within this District.

## FACTS

### CRC's Business

7.	For more than 30 years, CRC has delivered exceptional expertise and service to the commercial insurance marketplace. As a wholesale insurance broker, CRC does not work directly with insured entities. Rather, CRC serves as a key intermediary between retail insurance agents and insurance carriers. CRC's customers are retail insurance agents and brokers.

8.	A wholesale insurance broker acts as an intermediary between retail insurance agents and insurance carriers. In other words, CRC's "product" is that intermediary connection that its brokers provide. For example, a retail insurance agent may not be able to obtain insurance coverage for an insured because the type of risk is outside the retail agent's area of expertise or because the retail agent does not have access to particular insurance carriers. Wholesale brokers provide a valuable service to retail insurance agents and insureds by providing access to insurance carriers who underwrite certain types of insurance that the retail agent might otherwise not be able to obtain. In such cases a CRC broker, for example, would contact insurance carriers with whom CRC maintains relationships in order to obtain an

insurance policy for a retail broker that provides the amount and type of coverage needed by the insured. In so doing, CRC effectively matches the insured's need for coverage with the carrier that provides the desired coverage.

9. The intermediary connection that is CRC's product is forged from a combination of several components: the training CRC provides to its brokers, the relationships CRC fosters and pays its brokers to develop, and the historical data of past deals done. Over many years, CRC has invested time, large amounts of money, and effort in developing its confidential and commercially valuable information which is at the core of each of these components, which information is collectively referred to herein as "CRC Confidential and Proprietary Trade Secret Information." CRC Confidential and Proprietary Trade Secret Information includes, but is not limited to:

   a. Lists of customers and prospective customers, including special customer matters like their interest, needs, particular retail agent specialties, insured needs, risk factors applicable to particular insureds and industries, insurance program structures, renewal and expiration data, customers concerns and key contacts;

   b. Highly sensitive account details regarding particular CRC customers and accounts, including commission fee structures, customer file documents, business records, pricing information and sales plans;

   c. CRC financial matters, including pricing, profit margins, commissions and/or fees;

   d. Business, management and operational strategies and procedures;

   e. Structure and pricing of insurance programs that CRC has negotiated with particular underwriters and/or developed for particular industries; and

   f. Selective personnel information and data, including compensation structure, employees' performances, in particular the relative performance of its brokers and inside brokers, employees' strengths and weaknesses, assigned customer accounts, and related employee information.

10. CRC Confidential and Proprietary Trade Secret Information has independent economic value because it is not known either to CRC's competitors or generally within the

commercial insurance brokerage industry. CRC Confidential and Proprietary Trade Secret Information has been developed by CRC and is used by CRC for the purpose of developing and training its employees and allowing them to effectively and efficiently market, sell, deliver and manage insurance products and its services. CRC also provides its brokers with the strength of its 30-year reputation and goodwill in the industry, as well as CRC's back-office operations to provide the customer service to support that reputation.

11.     CRC's business success depends, in large measure, upon the skill of its brokers and the personal relationships that its brokers develop in the marketplace using CRC Confidential and Proprietary Trade Secret Information. The executive management of CRC work with the brokers to help them build relationships with retail brokers, whether it is enhancing and solidifying relationships with current retail broker clients or helping them to obtain new retail broker clients. Management is also very active in recruiting and training new brokers. CRC dedicates substantial monies, personnel hours and other resources to the creation and development of these relationships that are critical to CRC securing and conducting business as a wholesale broker. CRC's senior managers are highly compensated to manage broker teams at CRC. This involves knowing key financial statistics for its broker teams, strengths and weaknesses, areas of expertise, recruiting techniques, carrier needs, broker team strategies, retailer client information, prospective retailer clients. In addition, except during periods of public health emergency due to COVID-19, CRC pays to entertain retail brokers, with golf outings, trips, concerts, ball games, dinners and the like, in order to build relationships, engender trust, and learn about CRC's retail brokers' needs to be able to support them in the business. Key to those relationships is the discovery, retention and use of information about CRC's brokers, clients and accounts, the insurance carriers with whom CRC's brokers interact on behalf of

4

retail brokers, account details and information provided during transactions, insurance market specifics, and a vast panoply of other information that is found in CRC Confidential and Proprietary Trade Secret Information. CRC provides its employees with access to CRC Confidential and Proprietary Trade Secret Information, and expends significant time and resources training its brokers to use its contents and to conduct business at the highest levels of integrity and performance. The relationships that CRC has paid millions of dollars to develop, as well as the information that is harvested in and from those relationships, are of the utmost importance to CRC's success.

12. CRC has invested substantial time, money, and effort developing its trade secrets, know-how, and proprietary information, including, but not limited to, information technology products, processes and techniques, software and tools, confidential account and prospective account information, confidential information regarding retail brokers and carriers, company sales reports, analyses, marketing plans, research and account development plans, pricing strategies and business methods, specially negotiated terms with retail agents and on behalf of accounts for insureds, contractor relationships and identities, and other confidential information, and establishing its reputation and goodwill.

13. By investing substantial time and money in the development of personal relationships, and facilitating the continued development of these relationships, CRC builds goodwill with retail insurance brokers, understands their respective needs, and is able to serve their interests more directly and completely.

14. CRC has gone to significant lengths to protect its CRC Confidential and Proprietary Trade Secret Information. Specifically, CRC stores and maintains such information via a highly secure computer system, access to which requires multiple passwords, and is restricted

to Company employees. The building in which CRC's servers are maintained is secured with appropriate locks and other access control devices.

15. CRC also maintains a comprehensive data security plan, and imposes numerous employee controls to ensure that its trade secrets and confidential information are not provided to non-employees.

16. To further protect its trade secrets and confidential information, and to leave no doubt as to employees' post-employment obligations regarding the same, CRC also requires that certain of its employees to sign confidentiality and non-solicitation agreements as a condition of their employment with CRC.

### Hahn's Confidential Information, Non Compete and Non-Solicitation Agreement

17. On October 20, 2010, Hahn signed a Confidential Information, Non Compete and Non-Solicitation Agreement with C.G. (the "Hahn Agreement"). (A true and correct copy of the Hahn Agreement is annexed hereto as Exhibit A.)

18. The Hahn Agreement contains explicit terms regarding Hahn's obligations with respect to trade secrets and confidential information, as well as non-competition and non-solicitation provisions governing Hahn's post-employment obligations.

19. By signing the Hahn Agreement, Hahn acknowledged that he had a prominent role in the management of CRC's business and the development of its valuable goodwill, that his obligations thereunder were special, unique, and extraordinary, and that, by virtue of his work for CRC, he would have special access to confidential CRC information that is economically valuable, confidential, non-publicly available information used or intended for use in CRC's business, and which could be used by Hahn to compete unfairly with the CRC. Ex. A, ¶¶ 2, 8.

20. Hahn also acknowledged that, during his employment, he would be entrusted with access to "Confidential Information," as that term is defined in the Hahn Agreement, and expressly and voluntarily agreed that he would protect, treat as secret and confidential, and would not disclose any such information following his separation from the Company "without the prior written consent of the Board [of CRC] or its authorized representative." Ex. A, ¶ 2.

21. "Confidential Information" is defined in the Hahn Agreement as including:

> any confidential or proprietary trade secrets, customer lists, drawings, designs, information regarding product development, marketing plans, sales plans, manufacturing plans, management organization information (including but not limited to data and other information relating to members of the Board, the Company or any of its affiliates or to the management of the Company or any of its affiliates), operating policies or manuals, business plans, financial records, packaging design, marketing, sales or customer information, or other financial, commercial, business or technical information (a) relating to the Company or any of its affiliates or (b) that the Company or any of its affiliates may receive belonging to suppliers, customers or others who do business with the Company or any of its affiliates.

Ex. A, ¶ 2.

22. Under the terms of the Hahn Agreement, Hahn also expressly and voluntarily agreed that, during the period from the execution of the Hahn Agreement until "the second anniversary of the date of termination of my employment":

> I shall not directly or indirectly, for my own account or for the account of any other natural person, firm, partnership, limited liability company, association, corporation, company, trust, business trust, governmental authority or other entity (each, a "Person") in any jurisdiction in which the Company or any of its affiliates has commenced operations during my employment with the Company (the "Employment Period"), (i) solicit for employment, employ or otherwise interfere with the relationship of the Company or any of its affiliates with any natural person who is or was employed by or otherwise engaged to perform services for the Company or any of its affiliates at any time during the Employment Period (in the case of any such activity during such time) or during the twelve-month period preceding such solicitation, employment or interference (in the case of any such activity on or

>after my termination of, employment with the Company), other than any such solicitation or employment on behalf of the Company or any of its affiliates during the Employment Period, or (ii) induce any employee of the Company or any of its affiliates to engage in any activity, which I am prohibited from engaging in under any of the paragraphs of this [Agreement] or to terminate, his or her employment with the Company.

Ex. A, ¶¶ 3, 4.

23. Under the terms of the Hahn Agreement, Hahn also expressly and voluntarily agreed that, during the period from the execution of the Hahn Agreement until "the second anniversary of the date of termination of my employment":

>I shall not directly or indirectly, for my own account or for the account of any other natural person, firm, partnership, limited liability company, association, corporation, company, trust, business trust, governmental authority or other entity (each, a "Person") in any jurisdiction in which the Company or any of its affiliates has commenced operations during my employment with the Company (the "Employment Period"), (i) solicit for employment, employ or otherwise interfere with the relationship of the Company or any of its affiliates with any natural person who is or was employed by or otherwise engaged to perform services for the Company or any of its affiliates at any time during the Employment Period (in the case of any such activity during such time) or during the twelve-month period preceding such solicitation, employment or interference (in the case of any such activity on or after my termination of, employment with the Company), other than any such solicitation or employment on behalf of the Company or any of its affiliates during the Employment Period, or (ii) induce any employee of the Company or any of its affiliates to engage in any activity, which I am prohibited from engaging in under any of the paragraphs of this [Agreement] or to terminate, his or her employment with the Company.

Ex. A, ¶¶ 3, 4.

24. Under the terms of the Hahn Agreement, Hahn also expressly and voluntarily agreed that his violation of the restrictive covenants in the Hahn Agreement "will cause the

8

Company and its affiliates irreparable injury for which adequate remedies are not available at law." Ex. A, ¶ 8.

25. Hahn further agreed that, if he breached the restrictive covenants in the Hahn Agreement, CRC "shall be entitled to an injunction, restraining order or such other equitable relief . . . as a court of competent jurisdiction may deem necessary or appropriate to restrain [him] from committing any violation of such covenants, obligations, or agreements." *Id*.

### The Non-Solicitation Provision of the Agreement Expressly Prohibits Hahn From Soliciting CRC Employees For Employment and Inducing CRC Employees to Terminate Their Employment with CRC

26. The non-solicitation provision in the Hahn Agreement expressly prohibits Hahn from soliciting any CRC employees for employment. *See* Ex. A, ¶ 4.

27. The non-solicitation provision in the Hahn Agreement also expressly prohibits Hahn from inducing any CRC employee to terminate his or her employment with CRC. *See* Ex. A, ¶ 4.

28. Hahn's express agreement to refrain from the above-referenced conduct for a specified period of time following his employment with the Company constitutes a limited non-solicitation agreement that is enforceable under Delaware State law. Ex. A, ¶ 9.

### C.G. Assigns Its Rights and Obligations Under the Hahn Agreement to CRC

Pursuant to the Assignment, CRC assumed C.G.'s rights and obligations under various agreements, including the Hahn Agreement.

### Hahn's Employment with CRC

29. Simultaneous with and as part of the Assignment, Hahn became a CRC insurance broker based at CRC's Long Island, New York location.

30. Hahn worked for many years under the terms of the Agreement, in exchange for pay from CRC. In so doing, Hahn ultimately ascended to the position of Regional Director, a senior, management-level position to which he was elected by CRC's Board of Directors. In that role, Hahn reported directly to CRC's President of Commercial Solutions.

31. CRC performed all of its obligations under the Agreement during the period of Hahn's employment with CRC.

**In His Position as Regional Director, Hahn Managed CRC's Strategic Objectives and Operations, and Had Access to CRC Confidential Information**

32. In his position as Regional Director, Hahn managed CRC's strategic objectives and operations with respect to the substantial and significant territory for which he was responsible: (i) New York; (ii) New Jersey; and (iii) New England (the "Northeast Territory").

33. <u>In so doing, Hahn was responsible for, among other things, positioning CRC brokers to maximize CRC's performance for clients in those areas, and supporting those brokers' efforts to establish new client relationships, and maintain and service existing ones. By virtue of that work, Hahn was at the center of CRC's business efforts in the Northeast Territory, and had a firm grasp on CRC's brokers' business relationships, broker performance, and client needs in that region. Regarding broker performance, Hahn not only knew the substance and size of each broker's book of business, he also understood each broker's (i) place in CRC's operation and the marketplace at large; (ii) prospects; and (iii) anticipated future performance.</u>

34. During his employment with CRC, Hahn had access to and utilized CRC Confidential Information, including CRC's customer and account lists, customer and account names and contact information, and the compensation that certain CRC employees received from CRC.

35. CRC's customer and account lists, in particular, are the lifeblood of its business, and its relationships with retail brokers are one of its most valuable assets.

36. CRC developed and cultivated the retail brokers it serviced at great expense and over a number of years. CRC expends a significant amount of time, energy, and expense to cultivate and maintain retail broker relationships. Accordingly, CRC incurs substantial expenditures to maintain these retail broker relationships, including the money it spends every year for support staff, operations personnel, systems and support, management and compliance supervision, computer services and equipment, phones, mail, research, literature, seminars, trade and other professional news publications, promotional events, the retention of experts in various specialties, and the many other expenditures CRC incurs in maintaining its goodwill in the industry and in compiling its customer and Account lists. CRC also incurs significant expenditures in furtherance of its efforts to convert a prospective customer into a customer, including expenditures related to prospecting, marketing, travel, entertainment, and legal, compliance, and technology-related costs.

37. Hahn benefited directly from the goodwill, reputation, and name recognition generated by all of these expenditures and consequently maintained business relationships with customers on behalf of CRC and provided services to these customers, including placing accounts with carriers.

**CRC Aggressively Protects CRC Confidential Information**

38. CRC Confidential Information is not readily ascertainable outside of CRC and would not have been known to Hahn but for his employment with CRC.

39. CRC Confidential Information, if known to CRC's competitors, would confer a substantial value upon such competitors, and place CRC at a tremendous competitive

disadvantage. For example, if CRC's competitors had knowledge of the prices that CRC has obtained from certain insurance carriers, those competitors could use that knowledge to negotiate better pricing terms for themselves – thus robbing CRC of a valuable competitive advantage that it acquired over several years, and at a tremendous expense. Additionally, if CRC's competitors had knowledge of the compensation that certain employees received, or were due to receive, from CRC, those competitors could use that knowledge to tailor their efforts to solicit such employees for employment, or induce such employees to terminate their employment with CRC.

40. Knowledge of the expiration and renewal dates for the policies placed by CRC's for the Accounts, and knowledge of the carriers where the insurance for the Accounts was placed is also of significant worth to a competitor. For example, a competitor could use this information to get a renewal quote on a policy from an incumbent carrier and block CRC from getting a quote from that incumbent carrier on its Account.

41. CRC maintains the CRC Confidential Information in the strictest confidence through the use of rigorous procedures designed to ensure that confidentiality is maintained.

42. CRC limits access to CRC Confidential Information through the use of password protections for the computer databases that store it. The information can only be accessed via CRC's secure, password-protected corporate network.

43. Altogether, CRC takes numerous measures to preserve the confidentiality of the CRC Confidential and Information, including, but not limited to, the following:

    a. limiting the disclosure of CRC Confidential Information only on a need-to-know basis;

    b. implementing strong personnel policies that each employee acknowledges and promises to adhere to;

    c. conducting regular training on confidentiality and safeguarding customer information;

    d. distributing Code of Conduct manuals;

    e. requiring CRC employees to sign confidentiality and non-disclosure agreements before receiving access to CRC Confidential Information; and

    f. maintaining CRC Confidential Information on password-protected databases and in other secure areas.

**Hahn's Abrupt Resignation to Join a Direct Competitor and Breaches of His Contractual and Other Duties to CRC**

44. On September 15, 2021, Hahn abruptly resigned from CRC to begin working as a Vice President for another employer ("John Doe").

45. John Doe is a direct and substantial competitor of CRC.

46. Hahn's position with John Doe is substantially similar, if not identical, to the position he held at CRC, and involves a substantially similar, if not identical, customer base.

47. Concurrently, or shortly thereafter, at least 12 other CRC employees also resigned from CRC to work for John Doe.

48. Prior to his departure from CRC, Hahn directly solicited CRC employees to terminate their employment with CRC to work for John Doe.

49. Hahn's solicitation was targeted, and reflected his deep knowledge of each of his targets' respective books of business, prospects, and practices. Each of the brokers he solicited (i) worked in the CRC office that Hahn managed before he ascended to Regional Director; (ii) possessed valuable books of business; and (iii) maintained larger books of business than those brokers he elected not to solicit. Indeed, the only broker who did not accept Hahn's offer to join him at John Doe possessed a very large book of business.

50. Hahn used CRC Confidential Information in the course of directly soliciting CRC employees to terminate their employment with CRC to work for John Doe.

13

51. Hahn breached and continues to breach his contractual and other duties owed to CRC.

52. Hahn's breaches of his contractual and other duties owed to CRC are for his own benefit, and to the detriment of CRC.

53. Hahn's violations are ongoing and continuing.

## FIRST CLAIM FOR RELIEF

### (Breach of Contract)

54. CRC repeats and realleges each and every allegation set forth in paragraphs 1 through 53 as though fully set forth herein.

55. As previously described herein, on October 20, 2010, Hahn entered into the Hahn Agreement with C.G.

56. C.G. assigned its respective rights and obligations under the Hahn Agreement to CRC via the Assignment.

57. Hahn breached the Agreement by directly soliciting CRC employees to terminate their employment with CRC to work for John Doe, and by using CRC Confidential Information to do so.

58. CRC duly performed all of its obligations under the Agreement.

59. As a direct and proximate result of Hahn's misconduct, CRC has suffered and continues to suffer substantial money damages.

## SECOND CLAIM FOR RELIEF

### (Misappropriation of Trade Secrets and Confidential Information)

60. CRC repeats and realleges each and every allegation set forth in paragraphs 1 through 59 as though fully set forth herein.

61. CRC has expended significant time and expense to develop and safeguard the CRC Confidential Information. CRC Confidential Information has been developed with a substantial amount of effort and investment and cannot lawfully be acquired or duplicated by others. Further, such information is valuable to CRC as it gives it a competitive advantage and thus would be valuable to CRC's competitors. CRC Confidential Information is not known outside of CRC's business, is only known by employees and others involved in CRC's business, and is subject to measures to guard its secrecy.

62. Hahn agreed that CRC Confidential Information was protectable and that he has a continuing duty to protect such information from misuse or disclosure.

63. Upon information and belief, Hahn has knowingly misused and/or misappropriated CRC Confidential Information, in violation of his contractual obligations to CRC, and for his benefit. Upon information and belief, this misuse and misappropriation includes, but is not limited to, his efforts to use the CRC Confidential Information on behalf of John Doe.

64. As a direct and proximate result of Hahn's misconduct, CRC has suffered irreparable harm and will continue to suffer irreparable harm unless Hahn is enjoined from engaging in any such further conduct.

65. As a direct and proximate result of Hahn's misconduct, CRC has and will continue to suffer substantial money damages.

### **THIRD CLAIM FOR RELIEF**

**(Unfair Competition)**

66. CRC repeats and realleges each and every allegation set forth in paragraphs 1 through 65 as though fully set forth herein.

67. By his wrongful actions, Hahn has knowingly misappropriated confidential and proprietary information belonging to CRC for use in John Doe's business and has engaged in unfair competition with CRC.

68. By knowingly misappropriating CRC's confidential and proprietary information, Hahn will receive and already has unfairly received the benefit of his wrongful exploitation and appropriation of such information to compete directly with CRC, without incurring the time, effort, and expense invested by CRC in acquiring and developing the same.

69. As a direct and proximate result of Hahn's misconduct, CRC has suffered irreparable harm as a result and will continue to suffer irreparable harm unless Hahn is enjoined from engaging in any such further conduct.

70. As a direct and proximate result of Hahn's misconduct, CRC has suffered and continues to suffer substantial money damages.

## FOURTH CLAIM FOR RELIEF

### (Tortious Interference with Employment Relations)

71. CRC repeats and realleges each and every allegation set forth in paragraphs 1 through 70 as though fully set forth herein.

72. During the period that it employed Hahn, CRC was a party to contracts with certain other of its employees that included (i) obligations for those employees regarding CRC Confidential Information; and (ii) non-competition and non-solicitation provisions, respectively.

73. Hahn knew of CRC's contracts with those employees, and intentionally and maliciously interfered with CRC's relationships with those employees by, among other things, inducing them to (i) end their respective employment relationships with CRC; (ii) violate their

contractual obligations to CRC; and (iii) begin working for John Doe. Hahn knew and intended that this conduct would harm CRC.

74. As a direct and proximate result of the foregoing, CRC has suffered and will continue to suffer non-compensable financial losss.

75. As a direct and proximate result of the foregoing, CRC has suffered and will continue to suffer substantial money damages.

## FIFTH CLAIM FOR RELIEF

### (Breach of Fiduciary Duty)

76. CRC repeats and realleges each and every allegation set forth in paragraphs 1 through 75 as though fully set forth herein.

77. As a management-level employee entrusted with confidential and proprietary information and trade secrets, the Hahn owed, at all relevant times, fiduciary duties to CRC, including a duty not to use CRC Confidential Information in competition with CRC. This duty was assumed both during and after Hahn's employment with CRC.

78. CRC was entitled to place its trust and confidence in Hahn, and to expect that he would act with the utmost good faith toward carrying on its business.

79. As described herein, the Hahn knowingly and willfully breached his fiduciary duties in a number of ways, including, upon information and belief, interfering with and misappropriating CRC Confidential Information, misappropriating CRC's client relationships, and soliciting CRC employees to work for John Doe while they were still employed by CRC.

80. As a direct and proximate result of Hahn's misconduct, CRC has been greatly damaged. CRC has suffered irreparable harm as a result of Hahn's conduct and will continue to suffer irreparable harm unless Hahn is enjoined from engaging in any such further conduct.

81. In addition, due to the outrageous and unjustified nature of Hahn's conduct, CRC is entitled to a judgment against Hahn for punitive damages.

## SIXTH CLAIM FOR RELIEF

### (Conversion)

82. CRC repeats and realleges each and every allegation set forth in paragraphs 1 through 81 as though fully set forth herein.

83. CRC Confidential Information constitutes valuable property belonging to CRC.

84. Hahn has used and converted for his own benefit the property belonging to CRC to the exclusion of CRC's rights.

85. As a direct and proximate result of Hahn's misconduct, CRC has been greatly damaged. CRC has suffered irreparable harm as a result of Hahn's misconduct and will continue to suffer irreparable harm unless he are enjoined from engaging in any such further conduct.

86. As a direct and proximate result of Hahn's misconduct, CRC has suffered and continues to suffer substantial money damages.

## SEVENTH CLAIM FOR RELIEF

### (Injunctive Relief)

87. CRC repeats and realleges the allegations contained in paragraphs 1 through 86 above as though fully set forth herein.

88. CRC seeks injunctive relief to prevent the continuing harm stemming from Hahn's continued violations of CRC's contractual and other rights.

89. In the Hahn Agreement, Hahn acknowledged that any violation of the Agreement would cause CRC irreparable harm. Ex. A, ¶ 5(b).

90. Pursuant to paragraph 8 of the Hahn Agreement, Hahn agreed that CRC shall be entitled to seek an injunction in the event Hahn breaches his obligations with respect to CRC's confidential information and the non-solicitation of CRC employees.

91. Hahn's actions have caused, and unless restrained will continue to cause, CRC severe, immediate and irreparable injury for which CRC has no adequate remedy at law.

92. Absent injunctive relief, CRC will suffer monetary damages exceeding $75,000.

93. As a result of Hahn's continuing violations of CRC's contractual and other rights, CRC is entitled to injunctive relief restraining Hahn from further violations, as well as money damages as a result of such violations and other equitable and legal relief.

## **DEMAND FOR RELIEF**

WHEREFORE, CRC demands judgment against Hahn as follows:

A. Granting a permanent injunction to prevent the Hahn from violating the terms and conditions of the Hahn Agreement;

B. Granting a permanent injunction to prevent Hahn from misappropriating and converting CRC Confidential Information;

C. Ordering Hahn to comply with the non-solicitation provisions of the Hahn Agreement for a period of two (2) years from the date of the Court's Order;

D. Ordering Hahn to return to CRC any and all CRC Confidential Information or any other business information, records or documents containing CRC Confidential Information;

E. Awarding compensatory damages in favor of CRC for Hahn's violations of the Hahn Agreement;

F. Awarding compensatory damages in favor of CRC for Hahn's misappropriation of CRC Confidential Information;

G. Awarding liquidated damages pursuant to Section 5(c) of the Hahn Agreement for each Account that CRC lost due to Hahn's breaches of the Hahn Agreement;

H. Awarding compensatory and consequential damages in favor of CRC, including but not limited to an amount equal to its present and future lost business opportunities, lost goodwill, and lost market share, in an amount to be determined;

I. Awarding punitive damages in favor of CRC, together with all other monetary damages permitted by law, in an amount to be determined;

J. Awarding CRC its reasonable attorneys' fees and costs, and pre-judgment and post-judgment interest; and

K. Granting such other and further relief as the Court may deem just and proper.

Dated: New York, New York
March 28, 2022

OGLETREE, DEAKINS, NASH,
SMOAK & STEWART, P.C.

By  s/Evan B. Citron
Evan B. Citron
599 Lexington Avenue, 17th Fl.
New York, New York 10022
(212) 492-2500

*Attorneys for Plaintiff*
*CRC Insurance Services, Inc.*